FILED
2026 Sep-28 AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

**RICHARD LYNCH,**

**Plaintiff,**

**v.**

**SCHWARZE INDUSTRIES LLC,**

**Defendant.**

**Case No. 5:24-cv-1309-HDM**

# MEMORANDUM OPINION AND ORDER

Defendant Schwarze Industries LLC ("Schwarze") employed Plaintiff Richard Lynch from September 2022 until his voluntary resignation in October 2023. Lynch now sues Schwarze, asserting eight claims: race discrimination in violation of 42 U.S.C. § 1981 and Title VII (Counts One and Two, respectively), retaliation in violation of both Section 1981 and Title VII (Count Three), a race-based hostile work environment in violation of Section 1981 (Count Four), discrimination and retaliation in violation of the Age Discrimination in Employment Act (Counts Five and Six, respectively), common-law breach of contract (Count Seven), and common-law fraud in the inducement (Count Eight). (Doc. 1). Schwarze, in turn, asserts common-law counterclaims against Lynch for breach of contract (Counterclaim One) and unjust enrichment (Counterclaim Two). (Doc. 5 at 20–21).

Schwarze has moved for summary judgment on all eight of Lynch's claims, as well as its own two counterclaims, and the matter is fully briefed. (Doc. 33; Doc. 34; Doc. 43-1; Doc. 46; Doc. 74). Upon careful review of the briefing, record, and applicable law, and with the benefit of oral argument, the court finds that Schwarze's Motion for Summary Judgment is due to be **GRANTED** as to Counts One, Two, Three, Four, Five, and Six of Lynch's Complaint. After doing so, the court declines to exercise supplemental jurisdiction over Counts Seven and Eight and Counterclaims One and Two and will **DISMISS** them **WITHOUT PREJUDICE**, with Schwarze's motion as to those counts **DENIED AS MOOT**.

## FACTUAL BACKGROUND

The relevant facts of this case are divisible into two categories: (1) the terms of Lynch's employment at Schwarze, such as his salary, bonuses, title, and benefits, and (2) Lynch's day-to-day experience as an employee in Schwarze's manufacturing plant in Huntsville, Alabama. Because many of Lynch's claims assert some form of race or age discrimination and involve multiple corporate entities, the court offers two undisputed points as a global preface to all of the facts presented below. First, Plaintiff Richard Lynch is an African American man who was in his late fifties and early sixties at all times relevant to this case. (Doc. 40-10 at 3). Second, there are three relevant corporate entities: Defendant Schwarze and non-parties Alamo Group

("Alamo") and Henke Manufacturing ("Henke"). Alamo is a holding company that has its principal place of business in Seguin, Texas, (doc. 40-3 at 27, 105:7; doc. 40-5 at 6, 23:20–21), and owns various subsidiary companies, including Schwarze and Henke, (doc. 1, ¶¶ 10, 12; doc. 5, ¶¶ 10, 12; doc. 40-1 at 11, 36:13–14; doc. 40-38, ¶ 4). Henke manufactured snowplows and salt spreaders in Leavenworth, Kansas, until the plant closed in February 2023. (Doc. 40-1 at 11, 36:13–16; at 16, 55:23–56:1; Doc. 40-2 at 5, 17:9–13; Doc. 47-7, ¶ 8). Schwarze operates a manufacturing plant in Huntsville, Alabama, where it makes streetsweepers. (Doc. 40-1 at 16, 55:19–22). Schwarze concedes that, based on the number of people it employs, it qualifies as an "employer" under both Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, (doc. 1, ¶ 5; doc. 5, ¶ 5), the statutory bases for many of Lynch's claims. With those undisputed parameters about Lynch's race and age and the relevant corporations in place, the court turns to the specific facts giving rise to this case.

## I. The Terms of Lynch's Employment

On March 16, 2020, Henke hired Lynch as the Operations Manager at its manufacturing plant in Kansas. (Doc. 35-9 at 10; Doc. 40-1 at 11, 35:12–36:14; Doc. 40-38, ¶ 5).[1] Lynch's starting base salary at Henke was $135,000 and he was eligible

[1] While working at the Henke plant in Kansas, Lynch commuted from his home in nearby Kansas City, Missouri. (Doc. 40-1 at 8, 21:3–9).

for an annual bonus. (Doc. 40-1 at 12, 37:14–21; at 24, 88:4–6).[2] In April 2022, Alamo announced the closing of the Henke plant in Kansas in order to consolidate operations with a different facility in Wisconsin. (Doc. 40-1 at 12, 40:1–9; Doc. 40-2 at 43, 169:4–9). As part of this process, Alamo established a Key Position Retention Incentive program in which it offered select employees a bonus of twenty percent of their annual base salary if they agreed to remain employed at the Henke plant "until the consolidation process is complete in order to successfully transition the business and equipment out of the Leavenworth, Kansas plant." (Doc. 40-25 at 1; *see also* doc. 40-1 at 13, 43:16–44:11). The Key Position Retention Incentive required the employees to "remain employed at the Henke Manufacturing location in Leavenworth" until a predetermined date to be eligible for the bonus and expressly warned that an employee who "resign[ed] or accept[ed] another position with Alamo Group Inc. or an affiliate prior to [the] separation date . . . will not be eligible for a Key Position Retention Incentive." (Doc. 40-25 at 1). Lynch's base salary at this time had risen to $143,777, meaning he was eligible to receive a Retention Incentive bonus of $28,755.40 if he complied with the terms of the agreement. (Doc. 43-3 at

---

[2] Lynch devotes a substantial portion of both his Equal Employment Opportunity Commission charge, his Complaint, and his opposition to summary judgment to allegations about broken promises and discriminatory treatment he claims to have experienced from Henke and its executives during his employment there. (Doc. 1, ¶¶ 14–22, 42–50; Doc. 40-10 at 3–5; Doc. 43-1 at 2–3). Neither Henke nor any of its executives are or ever have been parties to this action, (*see* doc. 1, ¶ 5), and the court includes only the facts and arguments pertinent to Lynch's claims against Schwarze.

28, 109:20–110:8). Lynch accepted the Retention Incentive and kept working at the Henke plant to wind down operations in anticipation of the impending closure. (Doc. 40-1 at 13, 43:16–21).

While Lynch kept working at the Henke plant in the spring and summer of 2022, Alamo and Schwarze were soliciting applications to fill the position of Plant Manager at the Schwarze plant in Huntsville. (Doc. 40-1 at 13, 44:12–19; Doc. 40-38, ¶ 20). Amber Steele, the Director of Talent Management for Alamo, had previously worked with Lynch at Henke and contacted him in July to determine whether he was interested in the job, for which he had previously applied during an earlier vacancy. (Doc. 35-9 at 4, ¶¶ 17–18; Doc. 40-38, ¶¶ 3, 18, 20). When Lynch confirmed that he was, Steele put him in touch with a recruiter, and he formally reapplied for the position at Schwarze. (Doc. 40-1 at 13, 44:12–16; Doc. 40-2 at 7, 26:9–19; Doc. 40-38, ¶ 20). On August 22, 2022, Lynch had a virtual interview for the Schwarze job with Janet Pollock, Alamo's Vice President of Human Resources, and Mike Haberman, Alamo's Executive Vice President. (Doc. 35-9 at 2, ¶¶ 3, 7; Doc. 47-5, ¶ 4). At this interview, Haberman asked Lynch how much longer he planned to keep working, which Lynch interpreted as a subtle indication that Haberman was concerned about hiring a then-sixty-two-year-old. (Doc. 40-1 at 33, 122:2–15).

After his interview with Pollock and Haberman, Schwarze officially offered Lynch the role of Director of Operations at its Huntsville plant, (doc. 40-24), a higher position in the corporate hierarchy than the Plant Manager role for which he originally applied, (doc. 40-1 at 15, 52:4–17). Schwarze's original offer to Lynch included a base salary of $150,000 and eligibility for an Incentive Compensation Plan bonus (the "ICP Bonus") to be calculated based on a combination of objective and subjective criteria, such as the plant's performance. (Doc. 40-24). The discretionary ICP Bonus was to be paid annually in March based on the previous calendar year and was subject to modification and annual approval. *Id.*

Lynch was not satisfied with the proposed salary of $150,000 and negotiated this offer, a process that included Pollock, Haberman, and David Heigl, Schwarze's president. (Doc. 40-1 at 16, 53:10–54:2; Doc. 40-3 at 31, 121:8–15). Lynch asked for a base salary between $180,000 and $200,000, plus a bonus, but Haberman told him that such a salary was not feasible at that time. (Doc. 40-1 at 16, 53:19–54:11). Haberman told Lynch that if he "would help [Schwarze's president Heigl] turn the plant around and bring it back to profitability," Haberman would "take care of" him, *id.* at 15, 50:13–51:10, and get him "where [he] needed to be salary-wise," *id.* at 16, 54:12–22. Lynch and Haberman did not reduce any of these discussions about increased salary to writing, *id.* at 16, 56:14–19, and they never agreed on a specific number that Lynch's salary would reach in the future, *id.* at 20, 71:15–72:5.

Following these negotiations, Lynch was left with the *expectation* that his next raise would bring him a base salary of between $180,000 and $200,000, but no representation from Alamo or Schwarze to this effect. *See id.* at 20, 72:2–21. During the negotiations, Lynch and Haberman also came to a "special agreement" and "worked out [a] $20,000 bonus as a compromise" to the $28,755.40 Retention Incentive bonus that Lynch would forfeit by leaving Henke. (Doc. 40-1 at 21, 73:20–75:2; at 23, 84:20–24, 85:1; Doc. 40-3 at 30, 119:19–120:3; Doc. 47-5, ¶ 10).[3] On September 2, 2022, Lynch, apparently satisfied with the terms he negotiated, signed the Employment Agreement specifying a $156,000 base salary and the ICP Bonus, but not the $20,000 "special bonus." (Doc. 40-1 at 14, 48:9–15, 50:7; Doc. 40-23). As Director of Operations for the Huntsville plant, he reported directly to Heigl, Schwarze's president. (Doc. 40-1 at 17, 58:5–7).

To facilitate his move to Alabama, Lynch participated in the Management Relocation Program available to the employees of Alamo and its subsidiaries. (Doc. 40-1 at 17, 58:23–60:3; at 21, 75:12–23; Doc. 40-48). In this program, Alamo agreed

[3] In a post-deposition affidavit submitted to oppose summary judgment, Lynch testified, for the first time in this matter, that Haberman told him that his March 2023 "special bonus" would be approximately $56,000 to cover the full amount of his two Henke bonuses, i.e., the Key Position Retention Incentive and his annual production-based bonus. (Doc. 41-1, ¶ 9). This contradicts, without any attempt at explanation, Lynch's clear earlier deposition testimony that he and Haberman agreed on a $20,000 special bonus during negotiations, (doc. 40-1 at 21, 73:20–75:2; at 23, 84:20–24, 85:1), and he cannot rely on this inexplicable contradiction in the new affidavit to create a fact question to defeat summary judgment, *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

to reimburse certain qualifying employees for many of the basic costs incurred while moving, such as a house-hunting trip, up to ninety days of temporary living expenses, one trip home every thirty days during the temporary living period, packing, and shipping a car. (Doc. 40-1 at 17, 59:21–22; at 21, 75:12–23; Doc. 40-48 at 3). The Management Relocation Program required the participating employee to sign a Relocation Repayment Agreement in which he agreed to reimburse Alamo for one hundred percent of any relocation expenses if he voluntarily left his job within a year or fifty percent of relocation expenses if he left between one year and two years. (Doc. 34-1 at 63–64; Doc. 40-48 at 2). Lynch executed the Relocation Repayment Agreement on September 2, 2022, (doc. 34-1 at 64), the same day he accepted the job at Schwarze. Participating in the Management Relocation Program was neither mandatory nor a condition of Lynch's employment and he voluntarily signed the Relocation Repayment Agreement and accepted its terms. (Doc. 40-1 at 42, 157:2–22). Under the Management Relocation Program, Alamo agreed to cover ninety days of temporary living accommodations, including utilities, at no more than $2,500 per month. (Doc. 40-48 at 3). When Lynch found a six-month lease on an apartment in Huntsville that, in the aggregate, would cost the same or less than $2,500 per month for three months, Alamo agreed to extend his relocation benefits from the usual ninety days to six months. (Doc. 40-1 at 17, 59:14–18, 61:1; Doc. 40-2 at 36, 143:8–9; Doc. 40-37, ¶ 27).

Lynch began his new job as Schwarze's Director of Operations in Huntsville in October 2022. (Doc. 40-1 at 20, 69:10–12; Doc. 40-3 at 35, 138:17–19). During his employment at Schwarze, Lynch was never threatened with termination, demotion, or a reduction in salary. (Doc. 40-1 at 43, 161:8–44, 165:2). The only negative feedback that Lynch ever received from his superiors that even remotely implicated his performance of his duties was when Schwarze's president, David Heigl, "one time early on," raised the possibility of placing Lynch on a performance improvement plan because he believed Lynch was taking too many trips home to Missouri. *Id.* at 43, 162:4–163:2. Lynch pointed out to Heigl that the Management Relocation Program allowed for such return visits during the relocation period, *id.*; (doc. 40-48 at 3), and the matter went no further, (doc. 40-1 at 44, 166:3–5). Heigl never mentioned the performance improvement plan again and he and Lynch had a good working relationship during the latter's time at Schwarze. *Id.* at 44, 166:9–13.

Schwarze awards bonuses and raises in March of each year, although employees who have been at the company for less than a year generally do not receive raises. (Doc. 40-37, ¶¶ 19–21). In March 2023, approximately five months after starting his job the previous October, Lynch received the following: (1) a 3.2% raise, (2) the discretionary ICP Bonus provided for in his employment agreement in the amount of $7,800, and (3) the $20,000 "special bonus" that he and Haberman agreed on during negotiations the previous August. (Doc. 40-1 at 19, 68:4–19; at 21,

74:7–9; Doc. 40-3 at 27, 105:20–22; at 28, 110:20–21; at 51, 201:14–17; Doc. 40-29). Lynch's $27,800 bonus was the largest of any Schwarze employee that year, (doc. 40-3 at 26, 104:12–14), and his expectations as to his bonus were met, (doc. 40-1 at 21, 74:21–75:2), because he "got the bonus that [Haberman] had promised," *id.* at 23, 84:20–24, 85:1. Lynch was disappointed that his raise did not bring his salary between $180,000 and $200,000 and he spoke with Heigl, who told him that Alamo only paid its employees "for the here and now," not "for future expectations." (Doc. 40-1 at 20, 71:10–14). However disappointed Lynch might have been, it is undisputed that Haberman never represented to him that he would receive an even larger raise after a mere five months and he created this expectation in his own mind. *Id.* at 20, 71:23–72:21. Prior to its closure, Henke also awarded annual bonuses in March, but, in 2023, no former-Henke employees received production-based bonuses for 2022 because of the plant's closure in February. (Doc. 47-7, ¶ 8).

In April 2023, the month after receiving his raise and bonus, Lynch asked for a two-month extension of his Management Relocation Program benefits because he and his wife were having trouble finding a house in Alabama, (doc. 40-1 at 21, 76:4–23), and Alamo agreed to pay for another two months of temporary living expenses, *id.* at 21, 76:8–22, 77:17; (Doc. 40-40). All told, Alamo provided Lynch with $55,411.34 in relocation benefits across eight months rather than the usual three: six months of the full package and an additional two months of temporary housing.

(Doc. 40-1 at 22, 77:9–17; at 37, 138:3–8; Doc. 40-37, ¶ 28). Furthermore, in August 2023, after his relocation package expired the previous spring, Alamo offered Lynch a mortgage assistance package to help facilitate his move to Alabama. (Doc. 40-1 at 38, 151:14–17).

On September 29, 2023, Lynch received a job offer from another company with an anticipated start date in October 2023. (Doc. 41-5). Lynch voluntarily resigned from Schwarze on October 4, 2023, by providing a letter to Troy Butler in Human Resources and texting a copy to David Heigl. (Doc. 34-1 at 79; Doc. 40-1 at 42, 158:4–159:14). Heigl spoke with Lynch to see if Schwarze could do anything to induce him to stay, even raising the possibility of waiving the Relocation Repayment Agreement if he stayed until the end of November, but Lynch refused. (Doc. 40-3 at 59, 234:7–235:10). Lynch testified at his deposition that he resigned from Schwarze because of (1) the "treatment that [he] received from this company, from Alamo," (2) the "lack of promises or fulfillment of promises," or "empty promises," (3) the "treatment [he] received" while working at Schwarze, and (4) his "unmet salary expectations." (Doc. 40-1 at 24, 86:11–87:13). Robert Word, Divisional Controller at Schwarze, also testified that, throughout his employment at Schwarze, Lynch "had a lot of complaints with . . . Alamo . . . about compensation and promises that they had made that they had not fulfilled." (Doc. 40-4 at 10, 38:22–39:3).

Lynch's last day at Schwarze was October 18, 2023, (doc. 40-1 at 24, 85:15–20), approximately thirteen months after he accepted the job and signed the Relocation Repayment Agreement on September 2, 2022, (doc. 34-1 at 64). On Lynch's last day, Heigl sent him a letter reminding him that, per the terms of the Relocation Repayment Agreement that he voluntarily agreed to, he was required to reimburse Alamo for fifty percent of the $55,411.34 in relocation expenses it provided, i.e., $27,705.67. (Doc. 34-1 at 78). The letter informed Lynch that failure to tender payment within thirty days "will result in Schwarze taking actions to recover damages which may include litigation through a court of law." *Id.* Lynch claims that Schwarze subsequently sent him a copy of a proposed state court lawsuit, (doc. 43-1 at 11, ¶ 11), but there is no indication here that such a case has been filed. Lynch testified that he believes that he does not owe Alamo any of this reimbursement, (doc. 40-1 at 37, 138:9–11), and there is no suggestion in the record that he has paid any part thereof.

## II. Lynch's Day-to-Day Experience in the Schwarze Plant

In addition to the terms of Lynch's employment, it is also necessary to briefly examine his day-to-day experience in the Schwarze plant, much of which involves Robert Word, the Divisional Controller. (Doc. 40-4 at 3, 12:12–17). Word occasionally compared Lynch to B.B. King, the African American musician who died in 2015 at the age of eighty-nine, *see, e.g.*, Tim Weiner, *B.B. King, Defining*

*Bluesman for Generations, Dies at 89,* N.Y. TIMES, May 15, 2015. As Lynch would walk through the plant, Word "would be like, 'B.B. There goes B.B.,'" and, when Lynch pushed back, Word insisted that the comparison was apt because he resembled King. (Doc. 40-1 at 36, 134:10–23). Word admitted that he and other Schwarze employees would occasionally refer to Lynch as "B.B." and sometimes "B.B. King," (doc. 40-4 at 24, 95:4–96:13), but Lynch never reported them for doing so because he "didn't want to get Mr. Word in trouble," (doc. 40-1 at 36, 135:17–136:9). At first, Lynch thought they were merely joking but he became offended as the comparisons continued. (Doc. 40-1 at 36, 135:3–10). Additionally, Word asked Lynch how much longer he planned to continue working, which Lynch interpreted as concern about his age. *Id.* at 30, 112:8–31, 113:3,

The Schwarze plant also had a "Wall of Fame" bulletin board with photos of employees, some of which were edited to include pop culture references. (Doc. 40-1 at 34, 127:16–20; Doc. 40-16). One such photo on the Wall of Fame was Lynch's face edited onto the body of an African American (presumably B.B. King) playing a guitar. (Doc. 40-54). Lynch did not know about the Wall of Fame during his employment with Schwarze and only learned about it through the discovery process in this case. (Doc. 40-1 at 34, 127:21–128:1).

On December 20, 2023, more than two months after his last day at Schwarze, Lynch signed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC"). (Doc. 1-1). In his EEOC charge, Lynch claimed he was "subjected to ongoing race and age discrimination," (doc. 40-10 at 9), and "had no choice but to resign [his] employment because of the ongoing misleading promises and representations combined with a work environment full of racial discrimination and treatment," *id.* at 8. Lynch's EEOC charge, like his Complaint, is replete with allegations about alleged conduct by companies and people who are not parties to this case, *see generally id.*, but he does include many of the same allegations as in this matter, such as his March 2023 raise and bonus, the B.B. King references, and isolated questions about his age, *id.* at 6–9. The EEOC dismissed Lynch's charge and issued him a Right to Sue letter on July 3, 2024, (doc. 1-2), and he commenced this action on September 25, 2024, (doc. 1).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 mandates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1297 (11th Cir. 2022). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Summary judgment is proper when the movant shows an absence of evidence to support an essential element of the nonmovant's case." *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 752 (11th Cir. 2000). The court will construe all facts in the light most favorable to the non-movant, *Domante v. Dish Networks, LLC*, 974 F.3d 1342, 1345 (11th Cir. 2020) (per curiam), although it "may consider only that evidence which can be reduced to an admissible form," *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

## DISCUSSION

The court finds that Schwarze's Motion for Summary Judgment is due to be granted as to Counts One through Six in Lynch's Complaint. After doing so, the court declines to exercise supplemental jurisdiction over the state-law claims in Counts Seven and Eight and Counterclaims One and Two and will dismiss them without prejudice.

### I. Counts One and Two: Section 1981 and Title VII Race Discrimination

In Count One, Lynch asserts a claim for race discrimination under 42 U.S.C. § 1981, (doc. 1, ¶¶ 142–151), which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," 42

U.S.C. § 1981(a). Although not explicitly an employment law statute, *see id.*, Section 1981 has the effect of "prohibit[ing] employers from intentionally discriminating on the basis of race in employment contracts," *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). To succeed on his Section 1981 discrimination claim, Lynch must prove three things: (1) he belongs to a protected racial group, (2) he was subjected to an adverse employment action, and (3) his protected status caused the adverse employment action. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020); *Zhang v. Bd. of Regents of Univ. Sys. of Ga.*, No. 3:23-cv-149, 2025 WL 3721687, at *9 (M.D. Ga. Dec. 23, 2025).

In Count Two of his Complaint, Lynch alleges that Schwarze violated Title VII of the Civil Rights Act of 1964, (doc. 1, ¶¶ 152–162), which makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ," 42 U.S.C. § 2000e-2(a)(1). Thus, to succeed on his Title VII discrimination claim in Count Two, Lynch must show the same three elements as in his Section 1981 claim in Count One: (1) protected status, (2) an adverse employment action, and (3) a causal connection

between the two. *See id.*; *Zhang*, 2025 WL 3721687, at *9.[4] "Both of these statutes have the same requirements of proof and use the same analytical framework," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Brown v. Shelby Cnty. Bd. of Educ.*, 719 F. App'x 889, 891 (11th Cir. 2017) (per curiam), and "it is appropriate to simultaneously discuss whether [a] Plaintiff has carried his burden with respect to both his Title VII and Section 1981 claims," *Allen v. PJ Cheese, Inc.*, No. 2:20-cv-1846, 2024 WL 2884170, at *13 (N.D. Ala. June 7, 2024). Accordingly, the court will analyze Lynch's Section 1981 claim in Count One and Title VII claim in Count Two in tandem because they suffer from the same flaw: the undisputed record shows Lynch did not suffer an adverse employment action.

In *Ismael v. Roundtree*, 161 F.4th 752 (11th Cir. 2025), the Eleventh Circuit provided "a roadmap for district courts regarding the review of summary judgment motions in the context of employment discrimination." *Cunningham v. Mercedes-Benz U.S. Int'l, Inc.*, No. 25-12423, 2026 WL 891844, at *3 (11th Cir. Apr. 1, 2026) (per curiam). Under *Ismael*, the court's first inquiry is whether the plaintiff can

[4] Discrimination claims under Section 1981 and Title VII have different standards for proving causation, *see, e.g.*, *Joyner v. City of Atlanta*, 170 F.4th 1320, 1345 (11th Cir. 2026), but the court's finding that Lynch suffered no adverse employment action obviates the need to consider how such a distinction might affect this case.

demonstrate a prima facie case of employment discrimination by showing all of the following: (1) he is part of a protected group, (2) he was well-qualified for the position in question, (3) he suffered an adverse employment action, and (4) he was treated less favorably than similarly situated employees outside of his protected group. 161 F.4th at 759, 764. If the undisputed evidence shows that the plaintiff cannot make such a showing, "[r]ather than lose by default," the court proceeds to the so-called "convincing mosaic" inquiry and asks whether the plaintiff has "produce[d] enough evidence, on [his] own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact." *Id.* at 765. The Eleventh Circuit has been clear that, "despite its flowery language . . . [the convincing mosaic inquiry] is a stand-in for the Rule 56 summary judgment standard applied to employment discrimination" and the court's ultimate question remains whether the plaintiff has identified enough evidence to permit a jury to find in his favor. *Id.* at 760; *see also Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) ("[A] 'convincing mosaic' is a metaphor [for the non-movant's burden in opposing summary judgment], not a legal test and not a framework."). Here, the court finds that Schwarze is entitled to summary judgment on Counts One and Two because the absence of an adverse employment action means Lynch cannot demonstrate a prima facie case of employment discrimination or a convincing

mosaic of evidence from which a jury could find in his favor. *Ismael*, 161 F.4th at 764–65.

a. Lynch Did Not Experience an Adverse Employment Action

The Supreme Court has held that an adverse employment action means conduct by the employer that "brought about some 'disadvantageous' change in an employment term or condition. The words 'discriminate against' . . . refer to differences in treatment that injure employees. Or otherwise said, the statute targets practices that treat a person worse because of sex or other protected trait," such as race. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (citation modified). An adverse employment action must cause "some harm respecting an identifiable term or condition of employment," *id.* at 355, meaning "a negative impact on 'the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way,'" *Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) (per curiam) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *abrogated on other grounds by White*, 548 U.S. 53). An "adverse [employment] action cannot be speculative," *Zienni v. Mercedes-Benz U.S. Int'l, Inc.*, No. 24-13932, 2025 WL 3708825, at *2 (11th Cir. Dec. 22, 2025) (per curiam), and, "[t]ypically . . . will 'affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone,'" *Henderson*, 826 F. App'x at 741

(quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam)); *see also Cole v. Oasis Healthcare, Inc.*, No. 2:24-cv-1669, 2026 WL 1495042, at *3 (N.D. Ala. May 28, 2026) (noting that the adverse employment action required for a discrimination claim "need not be significant, serious, or substantial, but it must be concrete."). Although terminations, demotions, pay cuts, and suspensions are more overt examples, the term "adverse employment action" also "encompasses less obvious changes in employment, including 'loss of benefits, denial of promotions, workplace reassignment, transfer, or change in permanent job title.'" *Diaz v. Mia.-Dade Cnty.*, No. 25-cv-20795, 2026 WL 820526, at *18 (S.D. Fla. Mar. 25, 2026) (quoting *Davis*, 245 F.3d at 1236).

Lynch bases his discrimination claims in Counts One and Two on the raise and bonus he received in March 2023, which he attempts to recast as Schwarze's failure "to pay [him] a fair and equitable salary as it promised" him, (doc. 1, ¶¶ 147, 157), or "withhold[ing] his fair pay," *id.*, ¶¶ 148, 158.[5] Lynch's position is unavailing, as the record makes clear that Schwarze did not break any salary-related promises or withhold anything: it simply did not give Lynch as large of a raise and bonus as he decided he was entitled to after a mere five months on the job. In moving

[5] In Counts One and Two, Lynch also alleges that Schwarze discriminated against him by "subject[ing] [him] to adverse terms and conditions, including racially hostile and derogatory comments," (doc. 1, ¶¶ 145, 155), while "White workers were not similarly adversely treated," *id.*, ¶ 159. These allegations are duplicative of the standalone hostile workplace claim in Count Four, *id.*, ¶¶ 174–186, and the court addresses them in the corresponding section of this opinion.

for summary judgment, Schwarze argues that the raise and bonus are not adverse employment actions sufficient to support Lynch's discrimination claims, regardless of how much he was disappointed in them, (doc. 34 at 11), and the court agrees. Schwarze points out that, not only does the undisputed evidence in this case reveal the *absence* of an adverse employment action in connection with the March 2023 raise and bonus, but Lynch was *affirmatively* treated quite well. *Id.* Far from refusing to pay him an adequate salary or withholding his pay, Lynch negotiated for and accepted a higher title and salary than the initial offer, and, a mere five months after starting his job, received a raise, despite the fact that Schwarze generally did not award raises to employees within the first year. Lynch himself testified that, in his experience, a 3.2% raise was "a standard increase" because "[u]sually . . . 1 to 4 percent is kind of the norm." (Doc. 40-1 at 20, 69:2–4). Although a key component of Lynch's Section 1981 and Title VII discrimination claims is his argument that Schwarze reneged on a promise to give him an even *larger* raise after a mere five months, (doc. 1, ¶¶ 88, 89), he made it perfectly clear at his deposition that he created this promise in his own mind:

> [Haberman's] exact words were, Rick, let's get you started. If you can turn this thing around, if you can help bring it back to profitability, I will take care of you. I will get you your bonus you were supposed to get at Henke, and I will get you where you need to be here. **So I thought – my understanding was I thought I would be getting a raise to bring me in that 180 to 200 range**.

(Doc. 40-1 at 20, 72:12–21) (emphasis added). When asked point blank whether he and Haberman agreed on a salary that his raise *might*, possibly, bring him up to, Lynch vaguely asserted that "there was an offer made," *id.* at 20, 71:15–72:3, but he has identified no evidence suggesting it was reasonable for him to expect a larger raise than the one he received. He admits he "was expecting more based on [this] conversation," *id.* at 20, 69:5–6, and his problem with the raise was not that it was adverse in and of itself, but simply that "it was not as much as [he was] expecting," *id.* at 21, 73:15–19. However much Lynch may have been subjectively underwhelmed by the raise he received after a mere five months, his disappointment was not caused by some adverse action by Schwarze that reduced a larger raise to which he was entitled but simply by the fact that it failed to meet his personal expectations.

Schwarze also points out that, far from withholding pay or breaking promises, at the same time Lynch received his raise in March 2023, he received a $27,800 bonus, the highest of any employee that year. (Doc. 34 at 11). Of this sum, $7,800 was the production-based ICP Bonus provided for in his offer of employment from Schwarze but the remaining $20,000 was the "special bonus" he and Haberman agreed on to mitigate the loss of the $28,755.40 Key Position Retention Incentive he forfeited by leaving Henke. Far from an adverse action, Lynch himself testified that he was satisfied with his $20,000 special bonus because he "got the bonus that

[Haberman] had promised," (doc. 40-1 at 23, 84:18–24, 85:1), and testified plainly that his issue was with his underwhelming raise, as his expectation as to the bonus "was met," *id.* at 21, 74:21–75:2.

Schwarze also points out that, after Lynch received the raise and bonus he attempts to frame as adverse employment actions, he waited another seven months to voluntarily resign and, during his employment, none of his superiors ever expressed any dissatisfaction with the quality of his work, threatened to demote him, terminate him, or reduce his pay. (Doc. 34 at 11). Indeed, the record indicates that Schwarze never stopped trying to accommodate Lynch, extending his relocation package to eight months from the usual three and offering him a subsidized mortgage to facilitate his move from Missouri to Alabama.

It hardly needs to be said, but a successful negotiation, a raise, a bonus (including a voluntarily-assumed $20,000 bonus to honor an agreement it was not a party to), and the myriad other perks Schwarze offered Lynch, all culminating in his voluntary resignation, did not bring "about some 'disadvantageous' change in an employment term or condition," *Muldrow*, 601 U.S. at 354, and no reasonable jury could find they had a "negative impact on 'the terms, conditions, or privileges of [Lynch's] job in a real and demonstrable way,'" *Henderson*, 826 F. App'x at 741. Schwarze is correct that Lynch's attempt to frame his March 2023 raise and bonus as "concrete" adverse employment actions, *Cole*, 2026 WL 1495042, at *3, asks the

court to overlook the fact that he received the $20,000 special bonus for which he negotiated and was satisfied with, as well as a raise whose only flaw was that it fell short of his personal expectations. Such conduct by Schwarze is neither the more overt type of adverse employment action, "things like terminations, demotions, suspensions without pay," *Henderson*, 826 F. App'x at 741, nor the subtler forms of adversity, such as loss of benefits, denial of promotions, workplace reassignment, transfer, or change in permanent job title, *Diaz*, 2026 WL 820526, at *18. Lynch's raise and bonus, however much he may have been personally underwhelmed by them—and it bears emphasizing that Lynch has admitted that his expectations as to the bonus were met and his expectations of the raise were purely of his own creation—are not "significant standing alone," *Henderson*, 826 F. App'x at 741, and, as Schwarze correctly points out, there is no colorable argument that they were adverse employment actions, (doc. 34 at 11).

Lynch offers an unpersuasive response in his attempt to argue that his March 2023 raise and bonus were adverse employment actions. Although he is correct that, in *Muldrow*, the Supreme Court held that a discrimination plaintiff need not show that he suffered an employment action that *substantially* affected his terms of employment, (doc. 43-1 at 12–13), *Muldrow* did nothing to erode—and, indeed, explicitly reaffirmed—the requirement that he still identify *some* adverse action, *see Muldrow*, 601 U.S. at 350; *see also Cole*, 2026 WL 1495042, at *3. To his credit,

Lynch bows to the inevitable conclusion that the raise and bonus, in isolation, did not have "a negative impact on the terms, conditions, or privileges of [his] job in a real and demonstrable way." *Henderson*, 826 F. App'x at 741. Rather, in opposing summary judgment, Lynch's only attempt to frame his raise and bonus as adverse employment actions is to concede that, while Schwarze "did provide a small raise . . . and it also paid [him] a small merit increase . . . other employees that were White received larger promotional . . . bonuses and larger merit increases." (Doc. 43-1 at 13).

Although Lynch is correct that disparate pay can, in some circumstances, qualify as an adverse employment action, *see, e.g.*, *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018), it is not enough for him to simply identify employees outside his protected class who received larger bonuses and raises. Rather, the only way such patently favorable treatment as a bonus and raise could qualify as adverse employment actions would be if "similarly situated comparators outside the protected class received higher compensation . . ." *Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 606 (11th Cir. 2008) (per curiam). This is only common sense, as "[a]bsent a very large disparity between the raise given a [plaintiff] and the raises given to valid comparators . . . it is difficult to see how a raise in one's salary could constitute an *adverse* employment action." *Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 626 (E.D. Va. 2003) (citation and quotation marks

omitted).[6] Thus, the question is not whether Lynch was paid less than *any* white employees chosen at random—such a standard would invite a Noahic flood of litigation—but whether he was paid less than a similarly situated employee outside of his protected class.

In *Lewis v. City of Union City*, the Eleventh Circuit held that, in a discrimination claim, a valid comparator is one who was "similarly situated in all material respects" to the plaintiff. 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc) (internal quotation marks omitted). In this analysis, "a valid comparison will turn not on formal labels, but rather on substantive likenesses" and the "plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. UPS*, 575 U.S. 206, 231 (2015)). Other valid considerations when identifying an appropriate comparator for a discrimination-plaintiff include similarities in "the same basic conduct (or misconduct)," whether they are "subject to the same employment policy, guideline, or rule[s]," whether they are under the jurisdiction of the same supervisor, and any similarities in employment and disciplinary history. *Id.* at 1227–28 (internal citations

[6] Although the Eleventh Circuit has held that a smaller-than-expected raise is an adverse employment action when the employer took some action "that directly disentitles an employee to a raise of any significance," *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005), there is no suggestion that Schwarze did so. As Lynch himself testified, the "problem" with his raise is not that it was *reduced*, but simply that it did not meet rise to his expectations. (Doc. 40-1 at 20, 69:5–6).

omitted). Two recent decisions from this court aptly illustrate the *Lewis* comparator analysis in action.

In *Ward v. System Products and Solutions, Inc.*, the plaintiff was an African American woman who charged personal expenses to a company credit card, met with a corporate vice president to implement a repayment plan, and was subsequently fired. 631 F. Supp. 3d 1134, 1139–41 (N.D. Ala. 2022). To support her Title VII discrimination claim, she pointed out that her coworker, a Hispanic man named Heriberto Perez, also made personal charges to the company credit card and met with the same vice president to implement a repayment plan, but was allowed to complete his repayments without being terminated, and, indeed, was offered a promotion. *Id.* at 1140. In denying the defendant's motion for summary judgment, this court held that "[o]f the *Lewis* court's four comparator-analysis 'guideposts,' at least three unquestionably point . . . toward finding Plaintiff and Perez to have been similarly situated in all material respects" because (1) they engaged in essentially identical conduct, (2) they were subject to the jurisdiction of the same supervisor, and (3) their "shared history" with the credit cards was substantially similar. *Id.* at 1144. Perez was thus an appropriate comparator for the plaintiff and this court denied the defendant's motion for summary judgment. *Id.*

On the other hand, in *Cockrell v. Pickens County Commission*, this court found that the plaintiff failed to identify an appropriate comparator, No. 7:20-cv-

1922, 2023 WL 6276706, at *2–*3 (N.D. Ala. Sept. 26, 2023), in a case that bears a striking resemblance to Lynch's claims in Counts One and Two. The plaintiff, Yolanda Cockrell, was an African American woman who worked as an Assistant County Administrator for the Pickens County Commission, performing "duties [that] were clerical in nature, and included data-entry, bookkeeping, managing County finances, and recording the minutes for meetings of the County Commission." *Id.* at *1. The Pickens County Commission also employed a white man named Marlin McCool who "was responsible for supervising maintenance staff and performing a wide range of maintenance duties." *Id.* Cockrell requested a 9.6% raise that would have brought her salary up from $36,500 to $40,000, but the Pickens County Commission denied her request and she received "the same $1,040 raise" that "every employee except McCool received." *Id.* at *1, *4. When Cockrell found out that McCool received a raise of 21.2%, bringing his salary up to $36,400, she filed suit, alleging Title VII and Section 1981 race discrimination. *Id.* at *1.

In granting Pickens County's motion for summary judgment, this court found that McCool was not an appropriate comparator for Cockrell under *Lewis* because his "responsibilities as the Building and Grounds Maintenance Supervisor are so inherently different from Plaintiff's responsibilities as the Assistant Administrator for Pickens County, [that] the two cannot reasonably be considered similarly situated in all material respects." *Id.* at *2 (citation and quotation marks omitted). The

"inquiry is whether [Pickens County] treated similarly situated employees differently, not whether [it] wisely compensated differently situated employees," *id.* at *3, which is consistent with the Eleventh Circuit's holding that "[t]reating different cases differently is not discriminatory, let alone intentionally so," *Lewis*, 918 F.3d at 1222–23 (emphasis omitted).

This case has far more in common with *Cockrell* than *Ward*, as Lynch tries to wring disparate-pay discrimination claims out of the fact that employees of different races with different responsibilities, titles, seniority, employment histories, and, indeed, working for different companies within Alamo, received different salaries and bonuses. Lynch identifies three would-be comparators—Amber Steele, Robert Word, and Joseph Hendrickson, all white—in his attempt to spin his raise and bonus as adverse employment actions, (doc. 43-1 at 15), but, as correctly pointed out by Schwarze, the undisputed facts do not show that any of these three was "similarly situated [to him] in all material respects" to make them appropriate comparators, *Lewis*, 918 F.3d at 1218. Lynch's reliance on Amber Steele is perhaps the least persuasive, as she formerly worked for non-party Henke, presently works for non-party Alamo, and has never, at any time, worked for Schwarze or in any department other than Human Resources. (Doc. 47-7, ¶ 3). Lynch badly misrepresents Steele's testimony when he claims that she "received a 30%" promotional raise, as opposed to his 3.2%, (doc. 43-1 at 15), when his own evidentiary citation makes clear that

she did not get a discretionary 30% raise, as he would have the court believe: *she got a different job with a different company and the change in salary Lynch attempts to pass off as a "raise" was her new, higher salary*. (Doc. 40-2 at 38, 149:2–15). In his sur-reply, Lynch argues that he identified this change in Steele's pay—which he, again, misrepresents as a "promotional increase" rather than a higher salary for a new job at a different company—only "as evidence that the pay standards [she] administered for white employees were not applied to Lynch," (doc. 74 at 2–3), but this is patently not true. In his opposition to summary judgment, Lynch clearly sets Steele forward as a comparator whose treatment should be compared directly to his own, (*see* doc. 43-1 at 5–6, 15), without any reference to her administration of pay standards across the entire Alamo group of companies, (doc. 74 at 2–3). Steele is therefore not an appropriate comparator.

Lynch's reliance on Robert Word is similarly unavailing. Lynch's entire attempt to rely on Word, who has been employed as Schwarze's Division Controller since January 2013, (doc. 40-4 at 3, 12:12–19), is so short and patently insufficient that it may be quoted in full: "Word, the Controller, and a non-production position received a 4.0% merit increase, while Lynch received a 3.2% increase." (Doc. 43-1 at 15). Even setting aside the question of whether a 0.8% difference in raises is adverse, Lynch makes no argument and identifies no evidence from which a reasonable jury could find that he and Word were "sufficiently similar, in an

objective sense, that they 'cannot reasonably be distinguished,'" *Lewis*, 918 F.3d at 1228 (quoting *Young*, 575 U.S. at 231). If anything, referring to Word as "a non-production position," (doc. 43-1 at 15), while Lynch was Director of Operations at the plant, suggests that their roles at Schwarze do not have much in common and that it was perfectly reasonable to compensate Word, who had nearly ten years' seniority, differently. Word is therefore not an appropriate comparator.

In attempting to identify a comparator, Lynch leans most heavily on Joseph Hendrickson, (doc. 43-1 at 14–15), but this is as unavailing as his reliance on Steele and Word. Lynch points out that, in March 2023, while he received a merit salary raise of 3.2% and an ICP Bonus of $7,800, Hendrickson, Vice President of Sales and Marketing at Schwarze, received a merit raise of 6.9% and an ICP Bonus of $10,150, (doc. 74 at 2; *see also* doc. 40-29), but he offers no evidence that Hendrickson is an appropriate frame of reference for his own treatment. Hendrickson began working for Schwarze as a Product Manager in September 2007—more than fifteen years before Lynch began working there in October 2022—and attained his current position through a series of promotions. (Doc. 47-8, ¶ 5).[7] Lynch's starting salary in October 2022 was higher than Hendrickson's, despite the fact that Hendrickson "was working in a higher-ranking position." *Id.*, ¶ 7. What Lynch does *not* address—either

---

[7] The court may consider evidence Schwarze submitted with its reply in support of summary judgment to the extent that it responds to specific arguments made by Lynch. *See Lightsey v. Potter*, 268 F. App'x 849, 852 (11th Cir. 2008) (per curiam).

in his response or his sur-reply—is what qualifies Hendrickson as an appropriate comparator. He argues that the "relevant comparison is not between final salary figures in isolation but between the rate of increases, bonus payouts, and incentive awards," (doc. 74 at 2), but overlooks the fact that the *true* question is whether the two employees experiencing such disparate rates of compensation were "similarly situated in all material respects," *Lewis*, 918 F.3d at 1218. Lynch is silent on this point: he adduces no evidence to suggest he and Hendrickson were sufficiently similar, (*see generally* doc. 43-1; doc. 74), and, indeed, as with Steele and Word, the affirmative evidence indicates they were not.

To identify appropriate comparators for his discrimination claims, Lynch was required to identify employees who were "sufficiently similar, in an objective sense, that they cannot reasonably be distinguished," *Lewis*, 918 F.3d at 1228, but he has failed to do so. Lynch claims that Schwarze "has made no attempt to explain these disparate acts or provide a non-discrimination basis for the wage disparity," (doc. 43-1 at 13), but it is really the other way around: Lynch has not explained why he should have been treated comparably to Steele, Word, or Hendrickson. The summary judgment record of this case does not reveal the requisite level of similarities between Lynch and the three would-be comparators and often affirmatively demonstrates how different they were. In pointing to Steele, Word, and Hendrickson, Lynch "offer[s] no evidence regarding comparable job duties, responsibilities,

tenure, or qualifications," (doc. 46 at 12), and uses the same strategy that failed the *Cockrell* plaintiff by relying solely on the fact that some white employees received bigger raises and bonuses without stopping to address why he should have been treated comparably. *See Cockrell*, 2023 WL 6276706, at *3. The "inquiry is whether [Schwarze] treated similarly situated employees differently" than Lynch, not whether it "wisely compensated differently situated employees" such as Steele, Word, and Hendrickson. *Id.* There is no evidence of the sort of similarities between Lynch and his proposed comparators that this court found in *Ward* and the court agrees entirely with Schwarze's succinct summary of the problem with Lynch's argument: "He selectively lists raise percentages or incentives given to Hendrickson, Steele, and Word without explaining why or how those figures are comparable to his own. Speculation, unsupported assertions, and improper burden shifting cannot substitute for evidence." (Doc. 46 at 13) (citation omitted).

In sum, the undisputed evidence shows that Lynch cannot make out a prima facie case of employment discrimination because he did not suffer an adverse employment action. *Ismael*, 161 F.4th at 759. Rather, he relies only on the patently favorable treatment of a raise and a bonus and his only attempt to frame such conduct as adverse fails for a lack of appropriate comparators.

b. Lynch Has Not Identified a Convincing Mosaic of Discriminatory Treatment

Because the undisputed evidence shows that Lynch did not experience an adverse employment action, he will be unable to establish a prima facie case of race discrimination, *see id.* at 759, and the "court, therefore, [will] advance directly to the convincing mosaic inquiry," *id.* at 765. A plaintiff may assemble a convincing mosaic of employment discrimination sufficient to defeat summary judgment by pointing to (1) suspicious timing, ambiguous statements, and "other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) evidence that the employer's justification for the adverse employment action was pretextual. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation and quotation marks omitted). In cases, such as this one, in which the court has already determined that the plaintiff suffered no adverse employment action, the convincing mosaic inquiry is a short one: applying *Ismael*, this court recently recognized the commonsense proposition that "a mosaic must be set on something. Without an identifiable adverse employment action, [a plaintiff] necessarily fails to demonstrate a convincing mosaic of discrimination." *Cole*, 2026 WL 1495042, at *4; *see also Sumpter v. Grady Mem'l Hosp Corp.*, No. 1:21-cv-4801, 2024 WL 6473304, at *13 (N.D. Ga. Mar. 14, 2024) ("Furthermore, the convincing mosaic argument cannot overcome the lack of adverse employment action."). Thus, Lynch's failure to

identify an adverse employment action also necessarily means he has not identified any evidence from which a reasonable jury could find discrimination. *See Berry*, 84 F.4th at 1311

In sum, Schwarze is correct that Lynch's discrimination claims in Counts One and Two fail because the undisputed evidence shows that, contrary to his framing, his March 2023 raise and bonus were not adverse employment actions and were simply less than he was expecting. Lynch's only attempt to rebut this is unpersuasive, as he cherry-picks other employees, based solely on their race, who received different raises and bonuses without any attempt to explain how their treatment reflects that Schwarze discriminated against him. Because Lynch did not suffer an adverse employment action and has not established a convincing mosaic of discrimination, Schwarze is entitled to summary judgment on Counts One and Two. *Ismael*, 161 F.4th at 764–65.

**II. Count Three: Section 1981 and Title VII Retaliation**

In Count Three, Lynch alleges that Schwarze violated Section 1981 and Title VII by retaliating against him for engaging in protected conduct. (Doc. 1, ¶¶ 163–173). Title VII explicitly prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Although Section 1981 lacks such an express statutory provision, *see* 42 U.S.C. § 1981, the Supreme Court has held that

it likewise "encompasses retaliation claims." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008); *see also Turner v. McKesson Corp.*, No. 2:12-cv-2053, 2013 WL 4727651, at *7 (N.D. Ala. Sept. 3, 2013). Retaliation claims are also subject to the *Ismael* framework introduced *supra*, although the plaintiff's prima facie case requires that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal relationship between the two. *Ismael*, 161 F.4th at 759. "Adverse employment action" has a different and more demanding meaning in a retaliation claim than in a discrimination claim: whereas direct discrimination claims, such as Counts One and Two, *supra*, require only an action causing "*some* harm respecting an identifiable term or condition of employment," *Muldrow*, 601 U.S. at 354–55 (emphasis added), a retaliation claim requires action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Johnson v. Mia.-Dade Cnty.*, 948 F.3d 1318, 1326 (11th Cir. 2020) (quoting *White*, 548 U.S. at 68) (internal quotation marks omitted). Unlike in a discrimination case, this standard cannot be satisfied by an employment action that caused *any* change in the terms of employment, as a retaliation claim requires "action [that] is *materially adverse*, meaning that it causes *significant harm*," *Muldrow*, 601 U.S. at 357 (quoting *White*, 548 U.S. at 68) (emphasis added) (internal quotation marks omitted); *see also Wrightson v. Sec'y of Treasury*, No. 25-13676, 2026 WL 2254495, at *3 (11th Cir. Aug. 5, 2026) (per curiam) ("The [*Muldrow*] Court noted

that Title VII retaliation claims required significant harm, but declined to impose the same standard for discrimination claims.").

Schwarze argues it is entitled to summary judgment on the retaliation claim in Count Three because Lynch suffered no adverse employment action, (doc. 34 at 16–18), and the court agrees. As with Counts One and Two, Lynch bases his retaliation claim in Count Three on the theory that his March 2023 raise and bonus, which he, again, styles as Schwarze's "refus[al] to pay him salary increases, bonuses, and stock options,"[8] (doc. 1, ¶ 168; *see also* doc. 43-1 at 20), were adverse employment actions.[9] Schwarze argues—and the court agrees for the reasons set

[8] At no time during his employment at Schwarze was Lynch eligible for stock options. (*See* doc. 47-5, ¶¶ 17–18).

[9] In Count Three, Lynch also alleges that Schwarze retaliated against him "by demanding reimbursement for [his] relocation package," (doc. 1, ¶ 170), but this argument merits no serious consideration. First and foremost, Lynch's only attempt to support this position in opposing summary judgment relies on underdeveloped and conclusory assertions devoid of any authority supporting the proposition that it is an adverse employment action for an employer to attempt to enforce a contract that the employee admits he signed voluntarily, (*see* doc. 43-1 at 28), and the court need not consider them, *see Odyssey (III) DP X LLC v. PNC Bank, N.A.*, No. 2:13-cv-1433, 2014 WL 2050756, at *7 (N.D. Ala. May 19, 2014) (courts need not address "perfunctory and underdeveloped contention[s]"). Second, even overlooking the deficiency of Lynch's attempt to defend this position, no reasonable jury could find that Schwarze's attempt to enforce the Relocation Repayment Agreement was an adverse employment action. Schwarze merely reminded Lynch of his obligations under the agreement that he voluntarily signed and sought to enforce its plain terms, (doc. 34-1 at 78), which would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Johnson*, 948 F.3d at 1236. Even drawing all inferences in Lynch's favor, the Relocation Repayment Agreement was explicitly intended to govern Lynch's obligations in the event that he left his job within twenty-four months, (doc. 34-1 at 78; doc. 40-48 at 2), which is precisely what happened. Even the most deferential interpretation of these facts demonstrates that Schwarze merely reminded Lynch of the contractual obligations he voluntarily assumed and nothing more, which is not "materially adverse, meaning that it cause[d] significant harm," *Muldrow*, 601 U.S. at 357 (internal quotation marks omitted).

forth *supra*—that the undisputed record shows that Lynch's raise and $27,800 bonus in March after starting his job the preceding October were in no way adverse employment actions, however much he may have been underwhelmed by them. (Doc. 34 at 16–18). Lynch argues that Schwarze retaliated against him by giving him a lower "promotional increase[] . . . than what he had been promised," (doc. 43-1 at 20), but, as discussed *supra*, this "promise" existed solely in Lynch's mind, (*see* doc. 40-1 at 20, 69:2–6; at 20, 72:12–21), and the "failure" to abide by it was not an adverse employment action. Similarly, he repeats his argument that Schwarze caused him to "lose part of" his Henke bonuses, (doc. 43-1 at 1), but, far from reducing the bonus he forfeited by leaving Henke, Lynch himself testified that he received precisely the bonus for which he negotiated and was satisfied with it, (doc. 40-1 at 21, 74:21–75:2; at 23, 84:20–24, 85:1). Unsurprisingly, because his raise and bonus, followed seven months later by his voluntary resignation, did not cause Lynch "*some* harm respecting an identifiable term or condition of employment," *Muldrow*, 601 U.S. at 354–55 (emphasis added), for his discrimination claims, they are naturally

---

Relatedly, to the extent that Lynch suggests that Schwarze retaliated against him by writing him up "for engaging in unprofessional, racist language," (doc. 43-1 at 20), or asserting its two counterclaims, *id.* at 25, neither theory appears in the operative pleading in this matter and he cannot rely on them now, *see, e.g.*, *Williams v. Ala. Dep't of Indus. Rels.*, 685 F. App'x 888, 893 n.3 (11th Cir. 2017) (per curiam) ("[P]laintiffs may not raise new theories of relief for the first time" in opposition to summary judgment.); *Beeman v. Protective Life Corp.*, No. 2:17-cv-1234, 2020 WL 13656059, at *3 (N.D. Ala. Sept. 2, 2020) (plaintiff's would-be retaliation claim based on defendant's counterclaim was "not presently pending in this action" because plaintiff never amended his complaint to include it).

insufficient to meet his higher burden of identifying action that was "*materially adverse*, meaning that it cause[d] *significant harm*," for his retaliation claim, *id.* at 357 (emphasis added) (internal quotation marks omitted).[10] Upon finding that Lynch cannot make out his prima facie case of retaliation, the court turns to the convincing mosaic inquiry, *Ismael*, 161 F.4th at 765, but, again, comes to the commonsense conclusion that the absence of an adverse employment action means Lynch "necessarily fails to demonstrate a convincing mosaic" of discriminatory retaliation, *Cole*, 2026 WL 1495042, at *4.

In sum, Schwarze is correct that Lynch's retaliation claim in Count Three fails as a matter of law. The undisputed record shows that his raise and bonus were not "materially adverse, meaning that [they] cause[d] significant harm," *Muldrow*, 601 U.S. at 357 (internal quotation marks omitted), because their only "flaw" is that they fell short of Lynch's own expectations. Because he did not experience an adverse employment action, he also cannot establish a convincing mosaic of discriminatory retaliation and Schwarze is entitled to summary judgment on Count Three.

[10] Lynch, almost in passing, identifies one other instance of allegedly adverse employment action to support his retaliation claim that the court addresses with equal brevity: he claims that Heigl "threatened [him] with a performance improvement plan for taking one weekend off a month to travel back to Missouri," (doc. 43-1 at 20), but his own deposition testimony makes clear that this "threat" was merely Heigl raising the possibility of such a step one time during the early stages of his job based on a misunderstanding that was promptly rectified, (doc. 40-41 at 44, 166:3–13). No reasonable jury could find that this meets the high standard for an "adverse employment action" to support a retaliation claim. *See Johnson*, 948 F.3d at 1326.

## III. Count Four: Section 1981 Hostile Workplace

In Count Four, Lynch alleges that Schwarze violated Section 1981 by subjecting him to a hostile workplace on the basis of his race. (Doc. 1, ¶¶ 174–186). To succeed on this claim, Lynch must prove four things: (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment based on his race, (3) such harassment "was severe or pervasive enough to alter the terms and conditions of his employment," and (4) a basis for employer liability. *Melton v. I-10 Truck Ctr. Inc*, 166 F.4th 905, 918 (11th Cir. 2026) (quoting *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1249 (11th Cir. 2014)). In its Motion for Summary Judgment, Schwarze argues that Lynch did not experience harassment severe or pervasive enough to alter the terms and conditions of his employment, (doc. 34 at 11–16), and the court agrees.[11]

[11] Lynch styles Count Four as "§ 1981 Discriminatory Hostile Work Environment / Constructive Discharge," (doc. 1 at 22), and alleges that Schwarze's "harassment . . . was severe or pervasive, such that the terms and conditions of his employment were altered, and [he] was constructively discharged from his position," *id.*, ¶ 183. A constructive discharge claim requires a plaintiff to prove that his working conditions were "so intolerable that a reasonable person in [the employee's position] would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003). Because "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim," *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009), if a plaintiff's hostile workplace claim fails (as Lynch's does), the constructive discharge claim necessarily fails as well, *see, e.g.*, *Marquardt v. Ocean Reef Cmty. Ass'n*, No. 19-10110-CIV, 2020 WL 1812303, at *7 (S.D. Fla. Apr. 9, 2020); *see also Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd,* 511 U.S. 244 (1994) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").

The "severe or pervasive" prong "as defined by the Supreme Court, contains both an objective and a subjective component," *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002), which collectively require Lynch to prove that he "subjectively perceive[d] the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception [was] objectively reasonable," *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (quotation marks omitted). In moving for summary judgment, Schwarze focuses solely on Lynch's inability to satisfy the objective prong, (doc. 34 at 12–16), and the court cabins its analysis accordingly.[12]

To succeed on the objective prong of his "severe or pervasive" burden, Lynch must show that a reasonable person in his position would perceive the working environment to be so hostile or abusive that it alters the very nature of the job. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This inquiry is "not subject to mathematical precision[] but is judged from the circumstantial facts" of each case. *Melton*, 166 F.4th at 918 (citation and quotation marks omitted). Either severity or pervasiveness is sufficient for a Section 1981 hostile workplace claim, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010), and "[i]n

[12] Moreover, the court's finding that the undisputed evidence shows that Lynch cannot succeed on the objective prong obviates the need to consider the subjective prong. *See Miller*, 277 F.3d at 1276.

evaluating the objective severity of the harassment, [courts] consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance," *Miller*, 277 F.3d at 1276. Isolated, infrequent, and minor incidents are fundamentally unsuited to hostile workplace claims, which require conduct so "extreme [as] to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). This "demanding" standard is intended to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (internal quotation marks omitted).

For example, in *Nevins v. DCH Health Systems*, the plaintiff, an African American woman, heard at least two derogatory comments from a coworker about hair and hoodies and once returned to her desk to find "[w]hat appeared to be a blackface doll . . . hanging on a 'noose-type thing' from a thumb tack." No. 7:23-cv-1037, 2025 WL 1461303, at *11 (N.D. Ala. May 21, 2025), *aff'd*, No. 25-12124, 2026 WL 1103517 (11th Cir. Apr. 23, 2026) (per curiam). She sued on the theory that her employer fostered a racially hostile workplace in violation of Section 1981, *id.* at *5, but this court granted the defendant's motion for summary judgment, *id.* at *1. Although "[f]inding a blackface doll hanging by a noose at one's desk is both

offensive and distressing," it was, nevertheless, "an isolated incident" that was neither severe nor pervasive. *Id.* at *14. Likewise, the comments about hair and hoodies, "even if made . . . were non-severe and isolated." *Id.* However objectionable these occurrences were, they were insufficient to defeat summary judgment on the hostile workplace claim because such "[i]solated or sporadic incidents of harassment are not objectively severe or pervasive enough to alter the terms or conditions of employment." *Id.* (quoting *Shine v. Univ. of Ala. - Birmingham*, No. 22-10333, 2023 WL 1099766, at *3 (11th Cir. Jan. 30, 2023) (per curiam)) (internal quotation marks omitted). On appeal, the Eleventh Circuit affirmed, holding that, "[e]ven if the doll incident and the two comments were racial in nature, they were not sufficiently pervasive or severe to alter the terms of [the plaintiff's] employment," as they "were only three in number over a two-year period" and did not "unreasonably interfere[] with [the plaintiff's] job performance." *Nevins*, 2026 WL 1103517, at *6. *Nevins* thus illustrates the high bar a Section 1981 hostile workplace plaintiff must clear to prove that his "workplace is permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citation and quotation marks omitted).

In its Motion for Summary Judgment, Schwarze argues that Lynch's hostile workplace claim fails because he did not experience objectively severe or pervasive

harassment, (doc. 34 at 11–16), and the court agrees. Schwarze correctly points out that "Lynch identified only two categories of [allegedly harassing] conduct: the occasional references to 'B.B.' or 'B.B. King' and a bulletin board photo showing his face on B.B. King's body, and comments from controller, Robert Word," (doc. 34 at 14), which fall well short of the "demanding" standard for a hostile workplace claim, *Faragher*, 524 U.S. at 788.[13] The B.B. King references—both the nickname and the photo on the employee Wall of Fame—fall far short of "harassment" that is so objectively severe or pervasive as to alter the very terms of Lynch's employment. *Melton*, 166 F.4th at 918. First and foremost, although words alone can be offensive enough to be actionable in the right circumstances, *see, e.g.*, *Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848 (11th Cir. 2017) (per curiam) (discussing circumstances in which calling an adult African American man "boy" was indicative of racial animus), Lynch has provided no authority suggesting that comparisons between a private African American citizen and a well-known African American celebrity are objectively offensive to a reasonable person, much less offensive enough to alter the terms and conditions of employment. The extent of the nickname

[13] In his Complaint, Lynch also claims that Schwarze fostered a hostile workplace by subjecting him to "decreased pay, benefits, and incentives compared to white employees," (doc. 1, ¶ 175), and "denying him a promotion and pay increases," *id.*, ¶ 176. A hostile workplace claim, as opposed to the disparate treatment discrimination claims Lynch brings in Counts One and Two, focuses on the day-to-day nature of the working environment, not the intangible terms of the plaintiff's employment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (hostile workplace claims are meant to stop working environments permeated with "discriminatory intimidation, ridicule, and insult").

was that, "as [Lynch] would go through the plant, [Word] would be like, 'B.B. There goes B.B,'" insisting that Lynch looked like B.B. King, (doc. 40-1 at 36, 134:10–23), and Word testified that it "was just a nickname that stuck," (doc. 40-4 at 24, 95:20–96:13). Lynch himself testified that he "had no issues with Mr. Word" who "was kind of a jokester," (doc. 40-1 at 34, 125:13–20), and Word similarly testified that the two of them "went back and forth," with Lynch calling Word "Bobby" and Word calling Lynch "B.B." (Doc. 40-4 at 34, 95:9–19). In this context, even drawing all inferences in Lynch's favor, it is clear that the B.B. King nickname was exactly the type of "simple teasing" and "offhand comments" that cannot meet the "demanding" standard for a hostile workplace claim. *Faragher*, 524 U.S. at 788.

As to the B.B. King photo, which, again, Lynch never knew about during his employment at Schwarze, (*see* doc. 40-1 at 34, 127:21–128:1), he was not singled out, as the Schwarze plant had a Wall of Fame—or, per Lynch, Shame—with multiple other employees, *id.* at 34, 127:16–20; *see also* doc. 40-16. The photo would not be offensive enough to alter the terms of employment to an objective, reasonable person, *Melton*, 166 F.4th at 918, as it is simply his face transposed onto a body (presumably B.B. King's) holding a guitar and apparently in the middle of a performance. (Doc. 40-54). However much Lynch might have personally disliked the B.B. King references or the questions from Word about how much longer he planned to keep working, no reasonable jury could find that such conduct was so

"extreme [as] to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

As in *Nevins*, which involved significantly more distressing conduct, the incidents on which Lynch bases his hostile workplace claim are "[i]solated or sporadic incidents" and therefore "not objectively severe or pervasive enough to alter the terms or conditions of employment." 2025 WL 1461303, at *14 (quoting *Shine*, 2023 WL 1099766, at *3) (quotation marks omitted). Three of the *Miller* factors definitively weigh in Schwarze's favor, as the B.B. King references and Word's questions about retirement were not severe, physically threatening, and did not unreasonably interfere with Lynch's ability to do his job. *Miller*, 277 F.3d at 1276. The record does not permit a definitive answer to the remaining *Miller* factor—the frequency of the conduct—but, even assuming it occurred with greater than average frequency, no objectively reasonable person could find that it created a workplace permeated with discriminatory intimidation, ridicule, and insult sufficient to alter the very nature of the job, *Harris*, 510 U.S. at 21. Thus, Count Three fails because the "circumstantial facts" of this case, *Melton*, 166 F.4th at 918, do not demonstrate an atmosphere of harassment that was so "extreme [as] to amount to a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788.

The court would also be remiss not to point out the woeful insufficiency of Lynch's response to Schwarze's argument on his hostile workplace claim. (Doc. 43-

1 at 16–17). After a lengthy and essentially unapplied quote from *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551 (11th Cir. 1997), a case distinguishable from this one on the basis of its more egregious facts,[14] he turns to what can only be described as an airing of grievances. Without any citation to the record or case law or a coherent, structured response to Schwarze's hostile workplace argument, Lynch offers a stream-of-consciousness diatribe on his alleged mistreatment by non-party Alamo, who, he claims, "made [him] accept a position" where "[h]is pay was never going to be a priority." (Doc. 43-1 at 17). The only time he ever even remotely approaches his own hostile workplace claim against Schwarze that he is, theoretically, discussing, is the following drive-by, devoid of any citation or argument: "He was mocked and disrespected by having pictures and jokes made about his looks." *Id.* This failure to defend his own hostile workplace claim against Schwarze would itself warrant a finding that Lynch has abandoned the claim, *see, e.g.*, *Adams v. Bank of Am., N.A.*, 237 F. Supp. 3d 1189, 1203–04 (N.D. Ala. 2017), but, as discussed *supra*, the claim fails on the merits because the undisputed evidence shows that he did not suffer objectively severe or pervasive harassment, *Melton*, 166 F.4th at 918. Schwarze is therefore entitled to summary judgment on Count Four.

[14] In *Poole*, the plaintiff alleged that her coworker instructed other employees not to speak to her, gave her a chair with no desk, forced her to store her personal belongings in boxes on the floor next to her, and did not give her any duties or responsibilities. 129 F.3d at 552.

## IV. Count Five: Age Discrimination in Employment

In Count Five, Lynch alleges that Schwarze violated the Age Discrimination in Employment Act (the "ADEA") by subjecting him "to intentional discriminatory treatment and adverse terms and conditions of employment based on his age," (doc. 1, ¶ 193), as well as "age-biased and age-derogatory comments that permeated [his] work environment," *id.*, ¶ 194. Schwarze argues that it is entitled to summary judgment on Count Five because Lynch "suffered no adverse employment action as a result of his age," (doc. 34 at 20), and the court agrees.

Under the ADEA, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age," 29 U.S.C. § 623(a)(1),[15] and, "[t]o assert an action under the ADEA, an employee must establish that his age was the 'but-for' cause of the adverse employment action," *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (per curiam). In light of the similarities in the statutory text, as well as their common purpose of prohibiting employment discrimination, the Supreme Court and the Eleventh Circuit have long held that ADEA discrimination claims are subject to the same analytic framework as those arising under Title VII and Section 1981, *see, e.g.*, *Oscar Mayer & Co. v. Evans*,

[15] The ADEA protects "individuals who are at least 40 years of age," 29 U.S.C. § 631(a), and the parties agree that Lynch was in his late fifties and early sixties at all times relevant to this case, (doc. 1, ¶ 9; doc. 5, ¶ 9; doc. 40-10 at 1).

441 U.S. 750, 756 (1979); *Trask v. Sec'y, Dep't of Veterans Affs.*, 822 F.3d 1179, 1193–94 (11th Cir. 2016), *abrogated on other grounds by Babb v. Wilkie*, 589 U.S. 399 (2020). Thus, on summary judgment, ADEA discrimination claims are also analyzed under the *Ismael* framework introduced in Part I, *supra*, *see McCormick v. Cullman Reg'l Med. Ctr.*, No. 5:24-cv-820, 2026 WL 2364635, at *3 (N.D. Ala. Aug. 14, 2026), and the first question is whether the undisputed evidence shows Lynch can make out a prima facie case of age-based discrimination, *Ismael*, 161 F.4th at 764–65. As with Title VII and Section 1981, such a showing obviously requires that he experienced an adverse employment action, *Liebman*, 808 F.3d at 1298; *McCormick*, 2026 WL 2364635, at *4, that had "a negative impact on 'the terms, conditions, or privileges of [his] job in a real and demonstrable way,'" *Henderson*, 826 F. App'x at 741.

In its brief, Schwarze argues that Lynch's ADEA discrimination claim fails because he did not suffer an adverse employment action, (doc. 34 at 20), and the court agrees. Schwarze points out that, at Lynch's deposition, he was repeatedly asked point blank how Schwarze treated younger employees more favorably than it treated him but he was never able to provide an answer. *Id.* at 19 (citing doc. 40-1 at 54, 208:10–17; at 55, 209:9–14). Schwarze also points out that Lynch's raise, bonus, and voluntary resignation were not adverse employment actions, *id.* at 20, which is correct for the reasons explained in Part I, *supra*. Moreover, Schwarze argues—and

the court agrees—that the other events that Lynch has relied on to support his ADEA discrimination claim (Haberman's August 2022 question about his age during the interview, Word's undated question about his age, and the scattered B.B. King references) were so minor, insubstantial, or infrequent that no reasonable jury could find they caused "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355. On the undisputed record of this case, Lynch did not experience an adverse employment action sufficient to establish a prima facie case of age-based discrimination, *Ismael*, 161 F.4th at 759; *McCormick*, 2026 WL 2364635, at *4, which also necessarily means he cannot establish a convincing mosaic of discrimination, *Cole*, 2026 WL 1495042, at *4; *Sumpter*, 2024 WL 6473304, at *13.

As with his "argument" concerning the hostile workplace claim in Count Four, Lynch's attempt to defend Count Five in opposition to summary judgment is woefully insufficient, as he, once again, does not make any real attempt to respond to Schwarze or defend his own claim. He summarizes controlling law with no reference or application to this case, (*see* doc. 43-1 at 21–23), and then concludes with another "argument" that is generalized to the point of irrelevance, barren of any evidentiary citations, and so short it may be reproduced in full:

> Lynch has provided enough evidence to establish a prima facie case of age discrimination related to his adverse treatment, as well as evidence of wage disparity. The plaintiff can present either direct or circumstantial evidence that supports an inference of discrimination but

> is not required to produce contradicting evidence, as Defendant tries to argue in its brief.

*Id.* at 23. His argument in his sur-reply is no more illuminating, as he focuses solely on the proper standard for causation in an ADEA claim without any attempt to identify an adverse employment action. (Doc. 74 at 6–7). Thus, both because Schwarze is substantively correct that Lynch's ADEA discrimination claim fails because he suffered no adverse employment action and because of Lynch's deficient, passive response, *see Adams*, 237 F. Supp. 3d at 1203–04, Schwarze is entitled to summary judgment on Count Five.

**V. Count Six: ADEA Retaliation**

In Count Six, Lynch alleges that Schwarze violated the antiretaliation provisions of the ADEA by "changing the terms and conditions of his employment and refusing to pay him salary increases, bonuses, and stock options." (Doc. 1, ¶ 213).[16] Like Title VII, the ADEA has an explicit antiretaliation provision that

[16] The court notes that Schwarze never directly moves for summary judgment on Lynch's ADEA retaliation claim in Count Six: it devotes a section of its brief to arguing that it did not retaliate against him in violation of Title VII and Section 1981, (doc. 34 at 16–18), and another section to ADEA discrimination, *id.* at 18–20, but it never rearranges its arguments to squarely address ADEA retaliation. Nonetheless, the court finds it is appropriate to grant summary judgment in Schwarze's favor on Count Six because the "legal issue has been fully developed, and the evidentiary record is complete." *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) ("*Artistic*"). Moreover, the omission is one of form rather than substance, as an ADEA retaliation claim is subject to the same analytic framework as the Title VII and Section 1981 retaliation claim that both Lynch and Schwarze raise and discuss. *See Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 876 (11th Cir. 2025). Most importantly, Lynch seems not to have noticed the omission, as he devotes part of his response and sur-reply to arguing against summary judgment on the ADEA retaliation claim, (doc. 43-1 at 19–23; doc. 74 at 3–6), and, therefore, "had sufficient notice that the court might rule on the . . . claim[]," *Artistic*, 331 F.3d at 1202.

prohibits discrimination against an employee who has "opposed any practice made unlawful" by the statute. 29 U.S.C. § 623(d). A prima facie case of ADEA retaliation requires Lynch to show (1) that he engaged in conduct protected by the ADEA, (2) he suffered an adverse employment action, and (3) the adverse action was causally related to the protected conduct. *Ismael*, 161 F.4th at 759. Schwarze argues that Lynch did not suffer an adverse employment action sufficient to support a retaliation claim, (doc. 34 at 17), and the court agrees. Lynch, again, relies on his March 2023 raise and bonus to "claim[] retaliation based on Schwarze's purported refusal to pay salary increases, bonuses, and stock options," *id.*, but Lynch's argument on this point fails for identical reasons to those discussed *supra* in Part II: far from suffering adverse treatment, he received a discretionary raise and a $27,800 bonus after a mere five months on the job and then voluntarily resigned seven months later because of his personal disappointment. Such conduct from Schwarze would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *Johnson*, 948 F.3d at 1326 (quoting *White*, 548 U.S. at 68), and, far from causing "*significant* harm," *Muldrow*, 601 U.S. at 357 (emphasis added), it merely caused disappointment, as set out in Part II. Because Lynch cannot make out a prima facie case of discriminatory retaliation because he suffered no adverse employment action, *see Ismael*, 161 F.4th at 759, he also necessarily cannot identify

a convincing mosaic of discrimination, *Cole*, 2026 WL 1495042, at *4; *Sumpter*, 2024 WL 6473304, at *13.

In response, Lynch argues that his "promotional increase[] [was] less than what he had been promised," and claims he lost his Henke bonus, (doc. 43-1 at 20), but, as explained at length in Part I and Part II, *supra*, he is really complaining about the fact that Schwarze did not meet *his* salary expectations on *his* timeline. This falls well short of an adverse employment "action [that] is *materially adverse*, meaning that it cause[d] *significant harm*," for his retaliation claim. *Muldrow*, 601 U.S. at 357 (internal quotation marks omitted). Thus, Lynch has not identified any evidence to permit a reasonable jury to find that he experienced an adverse employment action, his ADEA retaliation claim fails as a matter of law, and Schwarze is entitled to summary judgment on Count Six.

## VI. Counts Seven and Eight and Counterclaims One and Two

Having found that Schwarze's Motion for Summary Judgment is due to be granted as to Counts One through Six of Lynch's Complaint, *supra*, the court declines to exercise supplemental jurisdiction over the state-law claims in Counts Seven and Eight and Schwarze's two counterclaims and will dismiss them without prejudice.

It is well-settled that "[f]ederal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and are

"obligated to inquire into subject matter jurisdiction sua sponte whenever it may be lacking," *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Courts are to presume that a claim lies outside of its subject matter jurisdiction "and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377; *see also Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005) ("The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim."). There are two primary types of original federal subject matter jurisdiction: federal question jurisdiction for "actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and diversity jurisdiction for cases where there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, *id.* § 1332(a). A court may also exercise so-called supplemental jurisdiction over any claim over which it lacks *original* subject matter jurisdiction if the claim is "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 25 (2025) ("[I]f the complaint also asserts state-law claims arising out of the same facts [as the federal claims], the federal court may adjudicate those claims too, in the exercise of what is called supplemental jurisdiction."). When a defendant asserts a state-law counterclaim that is compulsory because it "arises out of the transaction or occurrence that is the subject matter of

the opposing party's claim," Fed. R. Civ. P. 13(a)(1)(A), supplemental jurisdiction over that counterclaim "is automatic," *Battles v. Americredit Fin. Servs., Inc.*, No. 6:25-cv-917, 2025 WL 4060930, at *1 (M.D. Fla. Oct. 28, 2025); *see also Saravia v. Hunter*, No. 23-60469-Civ, 2023 WL 6037578, at *1 (S.D. Fla. Sept. 15, 2023) ("As applied to counterclaims, a compulsory counterclaim falls within the supplemental jurisdiction of federal courts . . . ." (citation and quotation marks omitted)).

Because supplemental jurisdiction is not a basis for original subject matter jurisdiction, after dismissing any federal claims, district courts have "the discretion either to continue to exercise supplemental jurisdiction over the state claims or to dismiss them." *Silas v. Sheriff of Broward Cnty*, 55 F.4th 863, 865 (11th Cir. 2022); *see also* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). Indeed, "every litigant who brings supplemental claims in court knowingly risks the dismissal of those claims," *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 539 (11th Cir. 2015), and the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial," *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam). The Supreme Court "has also put a thumb on the scale," *Silas*, 55 F.4th at 866, holding that "if the

federal claims are dismissed before trial . . . **the state claims should be dismissed as well**," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (emphasis added); *see also Royal Canin U.S.A., Inc.*, 604 U.S. at 32 ("[A]lthough supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court.").

Because "concerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claims after the federal claims are dismissed," a district court, "exercising its already broad discretion, will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed." *Silas*, 55 F.4th at 866. This court regularly does so. *See, e.g.*, *Little v. Topre Am. Corp.*, No. 5:25-cv-310, 2026 WL 2243785, at *8–*9 (N.D. Ala. Aug. 4, 2026); *Esters v. Strickland*, No. 2:20-cv-698, 2023 WL 4534604, at *11–*12 (N.D. Ala. July 13, 2023).

To discharge his burden of demonstrating subject matter jurisdiction over this matter, *Kokkonen*, 511 U.S. at 377, Lynch alleges that this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. (Doc. 1, ¶ 2(d)). Although he does not specify which of these two types of jurisdiction applies to each of his eight claims, *see id.*, it is only reasonable to assume he means to invoke federal question jurisdiction for Counts One through Six, which arise under various federal statutes, and supplemental jurisdiction for the

remaining state-law claims in Counts Seven and Eight. He is, obviously, correct that his claims under Title VII, Section 1981, and the ADEA in Counts One through Six "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1332, and the court further find it could exercise supplemental jurisdiction over Counts Seven and Eight because they are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367(a). As for the counterclaims, Schwarze does not explicitly assert a basis for jurisdiction, (*see* doc. 5 at 20–21), but the court finds that it could nevertheless exercise supplemental jurisdiction over them because they are compulsory rather than permissive, *Battles*, 2025 WL 4060930, at *1; Fed. R. Civ. P. 13(a)(1)(A).[17] Because it is granting Schwarze's Motion for Summary Judgment as to Counts One through Six, *supra*, the court, in the exercise of its broad discretion, must consider whether to continue exercising supplemental jurisdiction over the state-law claims and counterclaims remaining in this suit, *Silas*, 55 F.4th at 866; 28 U.S.C. § 1367(c)(3). In deference to the Supreme Court and the Eleventh Circuit's

---

[17] The Eleventh Circuit relies on a "logical relationship" test to determine if a counterclaim is compulsory. *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985) (per curiam). "Under this test, there is a logical relationship when 'the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant.'" *Id.* (quoting *Plant v. Blazer Fin. Servs., Inc.*, 598 F.2d 1357, 1361 (5th Cir. 1979)). The court has no trouble concluding that Schwarze's counterclaims are compulsory because they arise from Lynch's obligations under the Relocation Repayment Agreement, (doc. 5 at 20–21), which is also at least partially implicated by Lynch's retaliation claims, (doc. 1, ¶¶ 170, 215). The court may therefore exercise supplemental jurisdiction over Schwarze's counterclaims.

repeated encouragement to do so, *Royal Canin U.S.A., Inc.*, 604 U.S. at 32; *Raney*, 370 F.3d at 1089, as well as the strong preference for allowing state courts to decide questions of state law, *Silas*, 55 F.4th at 866, the court declines to exercise supplemental jurisdiction over Counts Seven and Eight of Lynch's Complaint and Schwarze's two counterclaims, 28 U.S.C. § 1367(c)(3), and will dismiss them without prejudice.

## CONCLUSION

For all the reasons stated herein, Defendant Schwarze Industries LLC's Motion for Summary Judgment, (doc. 33), is **GRANTED** as to Counts One, Two, Three, Four, Five, and Six of Lynch's Complaint. After doing so, the court declines to exercise supplemental jurisdiction over Counts Seven and Eight in Lynch's Complaint and Schwarze's two counterclaims and will **DISMISS** them **WITHOUT PREJUDICE**, with Schwarze's motion as to those counts **DENIED AS MOOT.** The court will enter a separate final judgment.

**DONE** and **ORDERED** on September 28, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE